**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| ANTHEM, INC.,<br><br>                  **Plaintiff,**<br><br>v.<br><br>CHAD PIPER,<br><br>                  **Defendant.** | )<br>)<br>)<br>)<br>)  **CIVIL ACTION NO.** 1:22-CV-450<br>)<br>)<br>)<br>)<br>)<br>) |

## VERIFIED COMPLAINT

Plaintiff Anthem, Inc. ("Anthem") brings this suit against Chad Piper ("Piper"), a former highly compensated President for an Anthem plan who has flagrantly violated his restrictive covenant obligations to obtain an unfair advantage over Anthem in a bid for a state contract worth billions of dollars. Absent immediate injunctive relief, Anthem faces the prospect of a competitor armed with its confidential bid strategy, weaknesses, and operational performance metrics. Anthem therefore files this Verified Complaint to obtain injunctive relief.

## PARTIES

1.      Plaintiff Anthem, Inc. is an Indianapolis-based business. Anthem is an Indiana corporation with its principal place of business in Indianapolis, Indiana. Anthem is registered to do business in the State of Indiana.

2.      Defendant Chad Piper is an individual and a citizen of Iowa. Piper is domiciled in Iowa and resides at 7309 150th Avenue, Indianola, Iowa 50125.

## JURISDICTION

3.      This Court may exercise jurisdiction over Count III of this Complaint because it arises under the laws of the United States, namely the Defend Trade Secrets Act, 18 U.S.C. § 1836. Accordingly, this Court has original jurisdiction over that claim under 28 U.S.C. § 1331.

4.      The Court also has subject matter jurisdiction in this matter pursuant to 28 U.S.C. § 1332 because complete diversity exists and the amount in controversy is in excess of $75,000.

5.      Anthem is a citizen of Indiana, and Piper is a citizen of Iowa. Thus, complete diversity is present.

6.      The amount in controversy is in excess of $75,000. As discussed in detail below, Anthem seeks to recover compensatory damages, injunctive relief, and its attorneys' fees and costs. Anthem's claim for compensatory damages alone is far in excess of $75,000. The injunctive relief sought is also far in excess of $75,000, because, absent the entry of injunctive relief, Piper will be free to compete against Anthem using Anthem's trade secrets and other confidential information and to solicit a customer and account (the Iowa Health Link account) about which he obtained trade secrets and other confidential information, resulting in damages to Anthem well in excess of the jurisdictional minimum.

## PERSONAL JURISDICTION AND VENUE

7.      Personal jurisdiction and venue is proper in this District and Division because Piper's RSU Agreements incorporate by reference the terms of Anthem's 2017 Anthem Incentive Compensation Plan (the "Incentive Compensation Plan"). A copy of the Incentive Compensation Plan is attached as **Exhibit 1.** The Incentive Compensation Plan includes a mandatory forum-selection clause setting venue exclusively in federal and state courts of Indiana for any disputes

2

"[t]hat may arise out of or relate to the Plan or any related agreements." (Incentive Compensation Plan § 21.11.)

## INTRODUCTION

8.     Anthem is an Indianapolis-based company that provides health care services to millions of Americans across the United States. To better serve its members, Anthem operates a number of network-based managed care plans to groups of all sizes, as well as to individuals and the Medicare and Medicaid markets.

9.     Anthem operates some of these plans through subsidiaries. One of its subsidiaries is Community Care Health Plan of Nebraska, Inc., a Medicaid and Children's Health Insurance Program ("CHIP") plan that operates in Nebraska. Community Care Health Plan of Nebraska, Inc. does business under the trade name "Healthy Blue Nebraska." Another one of its subsidiaries is Amerigroup Iowa, Inc. ("Amerigroup Iowa"), a Medicaid and CHIP plan that operates in Iowa.

10.     Defendant Chad Piper worked for Anthem as the President of Healthy Blue Nebraska. In this role he had responsibility for directing the plan's strategic, fiscal, regulatory, and operational activities. Befitting his title and seniority at Healthy Blue Nebraska, Piper was highly compensated and received multiple stock grants as part the Incentive Compensation Plan.

11.     Each stock grant Piper received under the Incentive Compensation Plan is governed by a Restricted Stock Unit Award Agreement ("RSU Agreement"). On March 1, 2021, Anthem issued Piper three stock grants, each covered by a separate RSU Agreement. The March 1, 2021 RSU Agreements are attached collectively as **Exhibit 2**.

12.     In exchange for receiving the restricted stock grants, Piper agreed to restrictions on his ability to use Anthem's confidential information, to compete with Anthem, to solicit Anthem's customers and accounts, and to solicit Anthem's employees.

3

13.     On November 23, 2021, Piper provided Anthem with notice that he was resigning. A copy of this notice is attached as **Exhibit 3**.  Piper's employment with Anthem ended a week later on November 30, 2021.

14.     In his resignation notice, Piper disclosed that his new employment "is with a competitor and is a like position but is not within the geographic area in which [he] currently serve[s]." (Resignation Notice, Ex. 3.) His purported reason for resigning was that the State of Nebraska may begin the process in the next several months to rebid its Medicaid managed care organization ("MCO") contracts – a significant event that requires enormous planning and strategic development. He claimed that the new role, which he did not identify, "is located in a separate state for which [he had] no confidential information, no direct Anthem operational knowledge or oversight, nor any known trade secrets." (*Id.*)

15.     The likely reason why Piper did not identify his role is because doing so would undermine what he said in his resignation notice.  Upon information and belief, Piper accepted a role as the CEO of CareSource's aspirant Iowa Medicaid plan—a substantially similar position with a direct competitor.  CareSource currently does not have a Medicaid MCO contract in Iowa. However, prior to Piper's resignation from Anthem, the Iowa Department of Human Services ("Iowa DHS") announced its intention to rebid its MCO contracts for the state's Medicaid managed care program, Health Link.  Amerigroup Iowa is currently one of only two Medicaid plans that participates in the Iowa Health Link program.  Upon information and belief, in his new role as the CEO of CareSource's Iowa aspirant Medicaid plan, Piper is currently leading CareSource's efforts in preparing and submitting its bid to Iowa DHS in direct competition with Anthem's bid. CareSource does not currently operate a Medicaid plan in Iowa, so Piper has no conceivable activities other than preparing for the forthcoming rebid.

16.     Contrary to Piper's representation that he had "no confidential information" about Anthem's operations in Iowa, Piper joined CareSource only after obtaining highly confidential insider information about Anthem's rebid strategy and extensive confidential information about Anthem's approach for the Iowa Health Link rebid. Indeed, on October 18, 2021, Piper attended a critical strategic planning review called a "Business Operating Review" presented by Jeff Jones, the Plan President for Amerigroup Iowa, where Jones provided detailed information about Amerigroup Iowa's operational metrics and its strategy for the Iowa Health Link rebid.

17.     After that presentation, and armed with his insider knowledge about Anthem's Iowa strategy, Piper saw an opportunity to capitalize on the confidential information he had been provided to obtain a "sizable increase in benefits and salary" by joining an Anthem competitor in Iowa.  On October 21, 2021 – a mere three days after attending the Business Operating Review about Iowa – Piper emailed himself a copy of his resume that he titled "Chad Piper _Iowa_Resume.docx.," and in late October or early November, he began interviewing for his new role with CareSource as its Medicaid plan president.

18.     Moreover, between October 21, 2021 and November 18, 2021, Piper forwarded several documents from his work email to his personal email, including documents expressly designated by Anthem as confidential, that are related to Anthem's strategy in the Iowa Health Link rebid.  As one example, and as discussed further below, on November 10, 2021, after receiving highly confidential information about Anthem's Medicaid strategy at Anthem's Medicaid Leadership Strategy Meeting, Piper forwarded himself a document prepared by Anthem's Market Competitive Intelligence ("MCI") team labeled "Iowa Health Needs Assessment." That document contains a link to a highly confidential 74-page assessment prepared by the MCI team for the Iowa Health Link rebid.

5

19.     Some of these forwarded emails, like his resignation notice, include obviously self-serving statements. For example, in a November 18, 2021 email that Piper forwarded to himself, he wrote, "This needs printed for NE Use[.]" This statement is likely nothing more than an attempt to provide a sheen of plausible deniability, because he provided Anthem with his resignation notice just two business days later.

20.     Instead of complying with his obligations to Anthem, which he acknowledged in his resignation notice, Piper has intentionally misled Anthem regarding the circumstances of his separation, his retention of trade secrets and other confidential information, and his compliance with his non-competition and non-solicitation obligations. Indeed, Anthem only conclusively determined that Piper joined CareSource when Amerigroup Iowa personnel saw him soliciting support for CareSource at the Iowa Capitol building:



21.     Piper's violations of the RSU Agreements, coupled with his misappropriation of Anthem's trade secrets and other confidential information, makes clear that immediate injunctive relief is necessary to protect Anthem's legitimate protectable interests.

22.     As discussed in more detail below and in Anthem's Motion for Temporary Restraining Order and Memorandum in Support thereof, Anthem respectfully requests that the Court enter immediate injunctive relief barring Piper from any involvement in the Iowa rebid and ordering him to return any Anthem trade secrets or other confidential information in his possession, custody, or control and to cause the remediation of any information about Anthem's bid strategy that he disclosed to CareSource.

## FACTUAL ALLEGATIONS

### A.     *Anthem's Legitimate Business Interests*

23.     Anthem is an Indianapolis-based company that provides health care services to millions of Americans across the United States. Anthem has approximately 64,000 employees, with more than 5,000 employees located in Indiana. To better serve Americans, Anthem operates a number of network-based managed care plans to groups of all sizes, as well as to individuals and the Medicare and Medicaid markets.

24.     Anthem, through its subsidiaries Healthy Blue Nebraska and Amerigroup Iowa, provides Medicaid plans throughout their respective states. These Medicaid plans operate by providing healthcare coverage through privatized Medicaid programs funded by a mix of federal and state funds.

25.     Anthem's success in the healthcare industry is a result of years of hard work and ingenuity.  Anthem's confidential, proprietary, and trade secret information and administrative and operational acumen allow it to maintain market share and thrive in an extremely competitive industry.  Anthem's business is profitable by virtue of its strategic structuring and implementation

of its provider networks, portfolio of member benefit plans, and substantial investments in operational improvement, all of which is driven by information that is regarded as highly confidential by Anthem and its competitors. Anthem has developed and maintained its competitive position in the market in large part because this confidential and proprietary information, which Anthem takes significant measures to safeguard from public dissemination.

26.     To maintain Anthem's competitive advantage and position in the marketplace, Anthem expends substantial time, effort, and expense developing trade secrets and other confidential business information, which include, but are not limited to: Medicaid plan operational parameters; Medicaid MCO contract procurement strategy; competitive intelligence about Medicaid bidding opportunities; community health demographic information; plan administration information and financial metrics; and other business methods, strategies, and plans, including sales strategies and methods.

27.     To protect its trade secrets and other confidential and proprietary business information, Anthem stores its trade secrets and confidential information on secure computer systems.  In addition, the information is compiled and stored in password-protected electronic databases, including proprietary internal programs through which Anthem aggregates and monitors information relating to its operations.  Access to confidential information is further restricted to specific user profiles so that users on the network have access only to specific folders rather than the entire universe of Anthem's trade secrets and confidential information.

28.     Anthem has spent a significant amount of time and money analyzing and refining its operational performance across various state plans. The Medicaid market in which Healthy Blue Nebraska and Amerigroup Iowa operate is particularly challenging, as Medicaid's covered population is comprised of poor and disabled individuals who often have more complex medical

18496647v.2

needs and higher carrying costs, thus requiring specific expertise to develop programs to serve the healthcare needs of these members.

29.     Anthem's trade secrets and other confidential information, and its experience operating complex health plans, provide it with a competitive advantage in the marketplace. In Iowa, for example, Amerigroup Iowa is one of only two Medicaid providers who is currently providing services in the State. Other Medicaid providers without the benefit and competitive advantage provided by Anthem's non-public, confidential information have been unable to successfully operate, accruing substantial losses providing care or extensive issues providing timely payment to providers.

### B.     Chad Piper's Employment With Healthy Blue Nebraska

30.     Piper joined Anthem through a corporate transaction in 2020. In 2019, Piper joined WellCare of Nebraska, Inc., as its Market Vice President. In 2020, Anthem acquired WellCare of Nebraska, Inc. from its parent company, WellCare Health Plans, Inc., and renamed WellCare of Nebraska, Inc. to Community Care Health Plan of Nebraska, Inc. d/b/a Healthy Blue Nebraska.

31.     Effective January 2021, Anthem promoted Piper to Regional Vice President of Operations for Healthy Blue Nebraska, and Anthem again promoted him to President in May 2021.

32.     In this role, Piper had substantial responsibility for Healthy Blue Nebraska's operational and financial performance. His duties included managing state and local relationships, captaining the plan's strategic goals, directing operations, and maintaining the plan's status as an approved Medicaid plan provider. In addition, Piper was responsible for preparing and executing the plan for an expected re-procurement for the Nebraska market.

33.     During his employment with Anthem as a highly compensated senior executive, Piper received the opportunity to participate in Anthem's Incentive Compensation Plan and receive restricted stock grants. On or about March 1, 2019, Piper received three separate restricted stock

grants collectively awarded several hundred thousand dollars in Anthem stock, subject to conditions enumerated in the RSU Agreements.

34.     The RSU Agreements contain restrictions on Piper's ability to use Anthem's confidential information, to compete against Anthem, and to solicit Anthem's customers, providers, and employees.

35.     In Section 7(a) of the RSU Agreement, Piper recognized that Anthem derives substantial economic value from its "Confidential Information," which is defined to include:

> plans, designs, concepts, computer programs, formulae, and equations; product fulfillment and supplier information; customer and supplier lists, and confidential business practices of the Company, its affiliates and any of its customers, vendors, business partners or suppliers; profit margins and the prices and discounts the Company obtains or has obtained or at which it sells or has sold or plans to sell its products or services (except for public pricing lists); manufacturing, assembling, labor and sales plans and costs; business and marketing plans, ideas, or strategies; confidential financial performance and projections; employee compensation; employee staffing and recruiting plans and employee personal information; and other confidential concepts and ideas related to the Company's business.

(*Id.* § 7(a).)  "Confidential Information" is also defined to include information protected by the Indiana Uniform Trade Secrets Act, unless such information is known to Piper or the general public through means other than a breach of a duty to maintain the confidentiality of such information.

36.     Piper agreed that, for so long as Anthem's Confidential Information remained confidential, he would not:

> (A) use Confidential Information for the benefit of any person or entity other than the Company or its affiliates; (B) remove, copy, duplicate or otherwise reproduce any document or tangible item embodying or pertaining to any of the Confidential Information, except as required to perform the Participant's duties for the Company or its affiliates; or (C) while employed and thereafter, publish, release, disclose or deliver or otherwise make available to any third party any Confidential Information by any communication, including oral, documentary, electronic or magnetic information transmittal device or media.

(*Id.*)

37.     In Section 7(b) of the RSU Agreement, Piper agreed to the following restriction on

his ability to compete against Anthem:

> During any period in which the Participant is employed by the Company, and during a period of time after the Participant's termination of employment (the "Restriction Period") which, unless otherwise limited by applicable state law, is (i) twenty-four (24) months for Executive Vice Presidents and the President & Chief Executive Officer, and (ii) the greater of the period of severance or twelve (12) months for all other Participants, the Participant will not, without prior written consent of the Company, directly or indirectly seek or obtain a Competitive Position in a Restricted Territory and perform a Restricted Activity with a Competitor, as those terms are defined herein.
>
> (i) Competitive Position means any employment or performance of services with a Competitor (A) the same as or similar to the services in which Participant performed for the Company in the last twenty-four (24) months of Participant's employment with Company, or (B) in which the Participant will use any Confidential Information of the Company.
>
> (ii) Restricted Territory means any geographic area in which the Company does business and in which the Participant provided services in, had responsibility for, had a material presence or influence in, or had access to Confidential Information about, such business, within the thirty-six (36) months prior to the Participant's termination of employment from the Company.
>
> (iii) Restricted Activity means any activity for which the Participant had responsibility for the Company within the thirty-six (36) months prior to the termination of the Participant's employment from the Company or about which the Participant had Confidential Information.
>
> (iv) Competitor means any entity or individual (other than the Company or its affiliates) engaged in management of network-based managed care plans and programs, or the performance of managed care services, health insurance, long term care insurance, dental, life or disability insurance, behavioral health, vision, flexible spending accounts and COBRA administration or other products or services substantially the same or similar to those offered by the Company while the Participant was employed, or other products or services offered by the Company within twelve (12) months after the termination of Participant's employment if the Participant had responsibility for, or Confidential Information about, such other products or services while the Participant was employed by the Company.

(RSU Agreement § 7(b).)

38.     In Section 7(c) of the RSU Agreement, Piper agreed to the following restriction on his ability to solicit Anthem's customers and accounts:

> During any period in which the Participant is employed by the Company, and during the Restriction Period after the Participant's termination of employment, the Participant will not, either individually or as an employee, partner, consultant, independent contractor, owner, agent, or in any other capacity, directly or indirectly, for a Competitor of the Company as defined in subsection (b) above: (i) solicit business from any client or account of the Company or any of its affiliates with which the Participant had contact, participated in the contact, or responsibility for, or about which the Participant had knowledge of Confidential Information by reason of the Participant's employment with the Company, (ii) solicit business from any client or account which was pursued by the Company or any of its affiliates and with which the Participant had contact, or responsibility for, or about which the Participant had knowledge of Confidential Information by reason of the Participant's employment with the Company, within the twelve (12) month period prior to termination of employment. For purposes of this provision, an individual policyholder in a plan maintained by the Company or by a client or account of the Company under which individual policies are issued, or a certificate holder in such plan under which group policies are issued, shall not be considered a client or account subject to this restriction solely by reason of being such a policyholder or certificate holder.

(*Id.* § 7(c).)

39.     In Section 9(a) of the RSU Agreement, Piper acknowledged that the restrictive covenants in the RSU Agreement "are reasonable and necessary to preserve the legitimate business interests of the Company, its present and potential business activities and the economic benefits derived therefrom; that they will not prevent him or his from earning a livelihood in the Participant's chosen business and are not an undue restraint on the trade of the Participant, or any of the public interests which may be involved."

40.     In Section 9(b) of the RSU Agreement, Piper agreed that the term of the restrictive covenants would be extended by the period that Piper was not in compliance with the RSU Agreement.

18496647v.2

### C. *Piper attends the Business Operating Review for the Iowa rebid and obtains critical insights into Anthem's Iowa financials, bid strategy, and competitive considerations.*

41.     One of the key responsibilities of a plan President is to ensure that his or her plan remains a state-approved Medicaid plan.

42.     Many states, including Nebraska and Iowa, have contracts with Medicaid managed care organizations ("MCOs") to provide healthcare to that state's Medicaid-eligible population. Under managed care, Medicaid recipients are enrolled in a private health plan, which receives a fixed monthly premium from the state.  The health plan is then responsible for providing for all or most of the recipient's healthcare needs.

43.     To determine which private healthcare companies are authorized to provide care under a state's Medicaid program, a state agency, usually the relevant department of health and human services, issues a competitive bidding process through a request for proposals ("RFPs" or "rebids") to rebid the state's Medicaid MCO contracts.  Anthem Medicaid plans are required to compete in these procurements with the state agency that administers the Medicaid program in their state at the end of their respective contract terms in order to retain their business. As a result, even in years when state Medicaid managed care programs are not in the procurement process, competitive bidding is always a near-term prospect because many state Medicaid MCO contracts have terms that last, on average, three (3) to five (5) years.

44.     The RFP/rebid process is a very detailed, robust, and resource-intensive process. To be well-positioned for a Medicaid managed care RFP takes months of planning, analysis, and execution. In addition to financial forecasting, Anthem embarks on a comprehensive review on the requesting state's needs, priorities, and unique challenges of that market to deliver a proposal that meets the rebid qualifications while also committing to unique and often proprietary solutions and innovations that will advance state priorities.

18496647v.2

45.     Anthem spent significant time educating Piper about Anthem's bidding processes and methodology. Anthem anticipated that Nebraska would be issuing an RFP in the somewhat-near future and invested substantial time preparing Piper for the procurement process.

46.     As part of that preparation, Piper received significant and detailed confidential information about Anthem's procurement strategy in Iowa, a neighboring state with similar healthcare needs, similar demographics, and similar issues relevant to its rebid process.

47.     Anthem also invited Piper to attend the Business Operational Review for Iowa on October 18, 2021. Normally, plan presidents from other states do not attend Business Operational Reviews for other states, but Piper received an offer to attend to familiarize himself with Anthem's bid process, observe how an experienced plan President approaches the bid process, and see how that strategy could be applied in Iowa, a market with similar characteristics to Nebraska.

48.     At the October 18 Business Operational Review, Jeff Jones, the plan President and CEO for Amerigroup Iowa, provided detailed information about Amerigroup Iowa's operational metrics and its strategy for the Iowa Health Link rebid.  The presentation included specific financial and operational metrics about the performance of Amerigroup Iowa's Medicaid plan, identification of the plan's "Top 3 Priorities for 2022," action items to maintain and improve the plan's financial stability and quality strategy, and a summary of the plan's community-based population health strategy, which included critical partnerships. It also included the identity of potential competitors that Jones expected to submit bids in connection with this rebid. CareSource is one of the competitors Jones identified during his presentation.

49.     Perhaps most crucially, in the Business Operational Review, Jones shared several risks that the plan faces, the financial impact of such risks, and Anthem's plan to resolve each of those risks.  This insider information—including Anthem's internal assessment of the plan's

vulnerabilities going into the rebid process—is precisely the information that a competitor like CareSource can use to target and exploit Anthem's vulnerabilities and strategy when preparing its own bid.

50.     Piper also participated and received pre-Business Operational Review materials about outstanding issues related to the forthcoming Iowa rebid, including common challenges, potential options to resolve those challenges, and potential barriers to resolving those problems.

**D.     Piper leverages Anthem's confidential information to obtain a competitive position.**

51.     Piper apparently saw that Anthem's generosity in preparing him for the upcoming Nebraska rebid provided him with a unique opportunity to take the playbook Anthem shared with him and use it to secure a position with a competing Iowa plan.

52.     Three days after the Iowa Business Operational Review, Piper emailed himself a copy of his resume that he titled "Chad Piper _Iowa_Resume.docx."

53.     On October 25, 2021, Piper had an interview or other meeting with CareSource.

54.     Piper then had a series of interviews with CareSource executives, including Jennifer Dougherty, SVP, Human Resources, Erhardt Preitauer, Chief Executive Officer, Jai Pillai, Chief Operating Officer, and Scott Markovich, Executive Vice President, Markets & Products.

55.     On November 2, 2021, Piper forwarded himself a videoconference link for an interview with Kirsten LaLuna, VP Corporate Social Responsibility for CareSource, scheduled for the same day at an unknown time. Approximately one minute before forwarding this videoconference link, Piper forwarded a copy of one of his RSU Agreements to his work email.

56.     Unaware that Piper was actively planning to compete against Anthem in Iowa, Anthem continued to provide Piper with highly confidential information and educate him about Anthem's rebid strategy.For example, from November 9-10, 2021, Piper attended an in-person

Medicaid Leadership Strategy Meeting in Indianapolis, Indiana with Anthem's national Medicaid President, individual Medicaid plan presidents, and other senior leaders. At the onsite Medicaid Leadership Strategy Meeting, Anthem's executives provided Piper and other plan presidents with highly confidential information regarding Anthem's overall Medicaid strategy, including its rebid strategy in states like Nebraska and Iowa.

57. Notably, as part of the Medicaid Leadership Strategy Meeting that Piper attended, Anthem's Chief Growth Officer for the Medicaid business, Aaron Lambert, provided a strategic overview of lessons that Anthem had learned through the rebid process in various states and Anthem's overall strategy to retain and grow its Medicaid business. Among other information, Lambert presented his team's analysis of what had worked well and had not worked well in other bids, outlined Anthem's strategy for submitting successful bids, identified gaps or vulnerabilities that Anthem faces in bids and Anthem's strategy for closing the gaps, and, of particular relevance to the procurement process in Iowa and Nebraska, provided an overview of Anthem's approach to health equity issues in rural populations. The information that Lambert provided in this presentation was nothing short of Anthem's playbook for Iowa and other Medicaid MCO contract bids and is precisely the information that a competitor like CareSource could use to gain a competitive advantage over Anthem in the procurement process and to prepare a more effective and compelling response to the Iowa rebid.

58. Moreover, over the next several weeks, Piper forwarded a number of Anthem documents to himself, including confidential and proprietary information that would be extremely helpful in preparing a response to the Iowa rebid.

59. To give just one example, one of the documents that Piper forwarded to himself on November 10, 2021 – the same day that he attended the Medicaid Leadership Strategy Meeting –

is a document prepared by Anthem's MCI team labeled "Iowa Health Needs Assessment." The document Piper emailed to himself contains a link to a 74-page health needs assessment to assist Anthem in preparing its bid strategy, which is a proprietary tool and work product solely for Anthem's internal use. The document also contains a high-level summary of content of the assessment and competitive intelligence about other companies that are likely to submit bids for the Iowa Medicaid MCO contracts, including CareSource.

60. On November 19, 2021, Piper attended another videoconference for a meeting with CareSource. On information and belief, Piper and CareSource discussed his resignation strategy at this meeting, including strategies to hide his affiliation with CareSource.

61. On November 23, 2021, Piper provided Anthem with notice that he was resigning. (Resignation Notice, Ex. 1.) In his resignation notice, Piper makes multiple false statements to Anthem, including the following:

(a)    "I had not embarked on a search for other employment but rather I was solicited regarding an opportunity." On information and belief, Piper was actively seeking employment in the Iowa market at the same time that he was given a front seat to Anthem's confidential bid strategy and operational data for Iowa.

(b)    "The opportunity, which has been extended to me, is with a competitor and is a like position but . . . . is located in a separate state for which I have no confidential information, no direct Anthem operational knowledge or oversight, nor any known trade secrets." As detailed in this Complaint, Piper received extensive confidential information about Amerigroup Iowa's operations, Anthem's bid strategy, strengths, and competitive concerns, and

other highly confidential and economically valuable information. This is likely why CareSource provided Piper with "a sizable increase in benefits and salary when compared to [his] current compensation."

62.     Because Piper disclosed that he was going to work for an undisclosed competitor in a similar position, Anthem terminated his employment on November 30, 2021.

   **E.     Anthem reminds Piper of his obligations to Anthem, which he ignores.**

63.     On November 30, 2021, Anthem sent a letter to Piper reminding him of his continuing obligations to Anthem, including his obligations to not disclose Anthem's confidential information and abide by his non-competition and non-solicitation obligations. A copy of Anthem's November 30, 2021 letter is attached as **Exhibit 4**.

64.     Anthem did not receive a response to this letter.

65.     Anthem later conducted an investigation and learned that Piper had wrongfully forwarded confidential information to his personal email. Around the same time, Anthem also confirmed that Piper had in fact gone to work for CareSource when he was seen in front of a CareSource-branded station at the Iowa State Capitol soliciting support for CareSource.

66.     In an attempt to avoid litigation, on February 16, 2022, Anthem sent another letter detailing its concerns to Piper and CareSource. Copies of these letters are attached, respectively, as **Exhibits 5** and **6**. In response, Piper falsely claimed that he did not have any confidential information regarding Anthem's operations in Iowa, though he conceded that he had forwarded Anthem information to his personal email.

67.     Despite Anthem's efforts to resolve its concerns through an agreement, Piper and CareSource refused to take sufficient measures to cure the harm caused by Piper's actions. Accordingly, Anthem has been forced to file this lawsuit to prevent it from participating in an rebid

18496647v.2

with a competitor who received a detailed, highly confidential breakdown of Anthem's bid strategy and development process.

## COUNT I
### Breach of Contract - RSU Agreements

68.     Anthem re-alleges Paragraphs 1-67 above, and incorporate them as if fully set forth herein.

69.     Piper entered into a valid and enforceable contract, the RSU Agreements, for valuable consideration. Piper has a continuing obligation to abide by the terms of the RSU Agreement and the restrictive covenants contained in that agreement.

70.     The restrictive covenants in the RSU Agreement are reasonably necessary for the protection of Anthem's interests in the customer relationships and goodwill associated.  Further, the restrictive covenants are reasonably necessary to protect Anthem's confidential information and trade secrets and customer, patient, and client goodwill.

71.     The covenants contained in the RSU Agreement remain in full force and effect for two years after the date of Piper's separation, through November 30, 2023, and Piper remains obligated to comply with those covenants.

72.     The restrictive covenants contained in the RSU Agreement are valid and enforceable.  They contain reasonable limitations as to the time, geographic area and scope of activity to be restrained, and do not impose a greater restraint than was necessary to protect Anthem's goodwill or other business interests.

73.     Anthem has satisfied all of its obligations under the terms and conditions of the RSU Agreement.  All conditions precedent to this action have been performed, excused, or waived.

74.     CareSource and Anthem are competitors and compete against each other in the Medicaid plan market segment. Piper acknowledged in his resignation notice that CareSource is a

18496647v.2

competitor to Anthem. CareSource is therefore a "Competitor" within the meaning of the RSU Agreements.

75.     Piper is employed as the President and/or CEO of CareSource's Medicaid plan in Iowa. This position is a "Competitive Position" within the meaning of the RSU Agreements because Piper has executive-level duties and because this position will require him to use Anthem's confidential information.

76.     Piper is employed in Iowa. Iowa qualifies as a "Restricted Territory" to the extent that Piper has any involvement in the pending Iowa rebid because he had access to confidential information about Anthem's rebid strategy and other economically valuable, non-public information.

77.     Piper's activity on behalf of CareSource involves his performance of "Restricted Activity" through his management of an rebid response, solicitation of stakeholder support, financial and operational management, strategic planning, and intentional and inevitable use of Anthem's confidential information.

78.     The Iowa DHS and the Health Link account qualify as a "client or account" because Piper obtained confidential information about the Iowa DHS and Health Link account through his employment with Anthem.

79.     By the acts described above, Piper has both directly and indirectly, breached the RSU Agreements by, among other things, competing against Anthem, soliciting the Iowa DHS and/or engaging in the solicitation of the Health Link account, using, copying, removing, and/or duplicating confidential information for reasons unrelated to his activity for Anthem, and failing to return Anthem's confidential information upon his separation, all in violation of the restrictive covenants in the RSU Agreement.

18496647v.2

80.     As a direct and proximate result of Piper's breaches of the RSU Agreements, Anthem has been harmed through the disclosure of its confidential information, impairments to its competitive position, Piper's unfair competition and solicitation, and Piper's continued retention of Anthem's confidential information.

81.     Piper, both directly and through his agents, has breached and will continue to breach the RSU Agreements through the acts detailed in this Complaint.

82.     Anthem stands without an adequate remedy at law, and, unless restrained by the Court, Piper's breach of the RSU Agreements will cause Anthem irreparable damage and injury.

83.     The threatened harm to Anthem if the Court does not grant such restraint outweighs the risk of harm to Russo from such a restraint.

84.     The public interest would not be disserved by the granting of an injunction.

85.     The restrictive covenants contained within the RSU Agreement should be extended for the period of time where Piper is found to have been violated the restrictive covenants in the RSU Agreement.

86.     Anthem has been damaged in an amount to be determined at trial.

## **COUNT II**
**Violation of the Indiana Uniform Trade Secrets Act (IC 24-2-3-1, *et seq.*)**

87.     Anthem re-alleges Paragraphs 1-86 above, and incorporate them as if fully set forth herein.

88.     Anthem's confidential and proprietary information includes, without limitation, Medicaid plan operational parameters; Medicaid MCO contract procurement strategy; competitive intelligence about Medicaid bidding opportunities; community health demographic information; plan administration information and financial metrics; and other business methods, strategies, and plans, including sales strategies and methods.

18496647v.2

89.    Anthem has taken, and continues to take, reasonable efforts to maintain the confidentiality and secrecy of such information.

90.    This information constitutes trade secrets pursuant to the Indiana Uniform Trade Secret Act because Anthem derives independent economic value, actual or potential, from this information not being generally known to, and not being readily ascertainable by proper means by, other persons who could obtain economic value from its disclosure or use, and because the information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

91.    By virtue of his employment with, and performance of responsibilities for, Anthem, Piper was given access to Anthem's trade secrets.

92.    Anthem's trade secrets contain detailed and specific information about Anthem's strategy for the Iowa Health Link rebid and other Medicaid MCO contract bids and is precisely the information that a competitor like CareSource could use to undercut gain a competitive advantage over Anthem in the bidding procurement process and to prepare a more effective and compelling response to the Iowa rebid.

93.    Given the nature of the information, Piper will inevitably us and disclose those trade secrets if he performs any services for CareSource related to CareSource's bid submission in the Iowa Health Link procurement process.

94.    Thus, Piper threatens to intentionally, wrongfully, willfully, and maliciously misappropriate Anthem's trade secrets and other confidential/proprietary information.

95.    By virtue of the foregoing, Anthem has demonstrated a likelihood of success and that a balancing of the equities favors the issuance of an injunction against Piper.

18496647v.2

96.     Piper's threatened misappropriation would cause irreparable harm to Anthem for which it has no adequate remedy at law.  Anthem cannot presently ascertain the exact extent, nature, and amount of such potential injury, which may not stand subject to precise calculation.

97.     As such, monetary damages alone cannot fully compensate Anthem for Piper's threatened conduct.

98.     Anthem stands without an adequate remedy at law, and, unless restrained by the Court, Piper's threatened misappropriation will cause Anthem irreparable damage and injury.

99.     The threatened harm to Anthem if the Court does not grant such restraint outweighs the risk of harm to Russo from such a restraint.

100.     The public interest would not be disserved by the granting of an injunction.

## COUNT III
### Violation of the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1832 *et seq.*)

101.     Anthem re-alleges Paragraphs 1-100 above, and incorporate them as if fully set forth herein.

102.     Anthem's confidential and proprietary information includes, without limitation, Medicaid plan operational parameters; Medicaid MCO contract procurement strategy; competitive intelligence about Medicaid bidding opportunities; community health demographic information; plan administration information and financial metrics; and other business methods, strategies, and plans, including sales strategies and methods.

103.     Anthem has taken, and continues to take, reasonable efforts to maintain the confidentiality and secrecy of such information.

104.     This information constitutes trade secrets pursuant to the Defend Trade Secrets Act because Anthem derives independent economic value, actual or potential, from this information not being generally known to, and not being readily ascertainable by proper means by, other

18496647v.2

persons who could obtain economic value from its disclosure or use, and because Anthem has taken reasonable measures to keep such information secret.

105.    By virtue of his employment with, and performance of responsibilities for, Anthem, Piper was given access to Anthem's trade secrets.

106.    Anthem's trade secrets contain detailed and specific information about Anthem's strategy for the Iowa Health Link rebid and other Medicaid MCO contract bids and is precisely the information that a competitor like CareSource could use to undercut gain a competitive advantage over Anthem in the bidding procurement process and to prepare a more effective and compelling response to the Iowa rebid.

107.    Given the nature of the information, Piper will inevitably us and disclose those trade secrets if he performs any services for CareSource related to CareSource's bid submission in the Iowa Health Link procurement process.

108.    Thus, Piper threatens to intentionally, wrongfully, willfully, and maliciously misappropriate Anthem's trade secrets and other confidential/proprietary information.

109.    By virtue of the foregoing, Anthem has demonstrated a likelihood of success and that a balancing of the equities favors the issuance of an injunction against Piper.

110.    Piper's threatened misappropriation would cause irreparable harm to Anthem for which it has no adequate remedy at law.  Anthem cannot presently ascertain the exact extent, nature, and amount of such potential injury, which may not stand subject to precise calculation.

111.    As such, monetary damages alone cannot fully compensate Anthem for Piper's threatened conduct.

112.    Anthem stands without an adequate remedy at law, and, unless restrained by the Court, Piper's threatened misappropriation will cause Anthem irreparable damage and injury.

18496647v.2

113.    The threatened harm to Anthem if the Court does not grant such restraint outweighs the risk of harm to Russo from such a restraint.

114.    The public interest would not be disserved by the granting of an injunction.

## REQUESTED RELIEF

WHEREFORE, Anthem requests that the Court grant the following relief:

1.    That Piper, along with his agents, employers, employees, attorneys and those persons in active concert or participation with his, be enjoined through a preliminary injunction and permanent injunction from violating the RSU Agreements, from misappropriating or disclosing Anthem's Confidential Information and trade secrets, from involvement in the Iowa rebid, from taking action to solicit the Iowa Department of Health or legislators in connection with the rebid; and ordering Piper to cause the identification and return of any Anthem trade secrets or other confidential information provided or disclosed to CareSource;

2.    That any preliminary or permanent injunction incorporate a tolling provision, whereby the protected periods specified in the RSU Agreement are tolled and extended for the length of time in which the Court determines that Piper violated the RSU Agreement;

3.    That Anthem be awarded compensatory damages in an amount to be proven at trial;

4.    That Anthem be awarded its costs and attorneys' fees incurred in bringing this action; and

5.    That the Court grant such further relief as it deems just.

## JURY TRIAL DEMAND

Anthem demands a jury trial on all issues triable as a matter of law.

Dated: March 7, 2022                                  Respectfully submitted,
                                                     By: */s/ Kandi Kilkelly Hidde*

18496647v.2

Kandi Kilkelly Hidde #18033-49
Darren A. Craig #25534-49
FROST BROWN TODD LLC
201 N. Illinois St., Suite 1900
P.O. Box 44961
Indianapolis, IN  46244-0961
317-237-3800
Fax: 317-237-3900
khidde@fbtlaw.com
dcraig@fbtlaw.com

Daniel P. Hart (*pro hac vice* to be filed)
dhart@seyfarth.com
Alex Meier (*pro hac vice* to be filed)
ameier@seyfarth.com

SEYFARTH SHAW LLP
1075 Peachtree Street, N.E.
Suite 2500
Atlanta, GA 30309-3958
Telephone:      (404) 885-1500
Facsimile:      (404) 892-7056

*Counsel for Anthem, Inc.*

26

## VERIFICATION

I, Jeffrey Jones, the President and Chief Executive Officer for Amerigroup Iowa, Inc., declare under penalty of perjury (28 U.S.C. § 1746) that I have read Paragraphs 8-67 in the Verified Complaint and Request for Temporary and Permanent Injunctions and that the facts stated in it are true to the best of my knowledge and belief.

Executed on March 7, 2022.

_Jeff Jones_____
Jeffrey Jones

27